## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| **v.** | :  **Criminal No. 24-cr-417 (CKK)** |
| | : |
| **TUCKER DESMOND,** | : |
| | : |
| **Defendant.** | : |
| | : |

### GOVENRMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following memorandum in aid of its sentencing recommendation for Defendant Tucker Desmond (hereinafter, "the defendant"). In short, the defendant was part of the social engineering enterprise led by co-defendant Malone Lam, in which he was responsible for assisting co-defendant Lam with a variety of tasks in service of the conspiracy, including dropping off fiat currency to co-conspirators, transporting luxury items purchased with illicit proceeds, and, ultimately, destroying evidence. While the defendant may not have been among the highest-ranking lieutenants within the enterprise, co-defendant Lam and others placed a significant amount of trust in him regarding particularly sensitive tasks, especially after law enforcement apprehended Lam in September 2024. Furthermore, while the defendant has ultimately pled guilty and accepted responsibility for his actions, his conduct during the pendency of this case, including his divulgence of sensitive information regarding a proffer session with the government to a pair of documentarians working on a documentary, suggest a lack of remorse and a continuing loyalty to the criminal enterprise for which he worked. Ultimately, therefore, the government is recommending a sentence of fourth months' incarceration and four months of home confinement, to be followed by a period of supervised release.

1

I.      **PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

On April 30, 2025, a federal grand jury sitting in the District of Columbia charged the defendant with one count of Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(1), in connection with his destruction of digital devices belonging to co-defendants Lam and Marlon Ferro. *See* ECF No. 50 at ¶ 44. The defendant agreed to plead guilty to the sole count with which he was charged pursuant to a plea agreement with the United States. *See* ECF No. 222. The Court ultimately accepted that guilty plea on October 15, 2025, and referred the matter to the U.S. Probation Office for the District of Columbia ("USPO") to complete a pre-sentence investigation report. *See* Oct. 15, 2025 Minute Order.

In support of his guilty plea, the defendant agreed to and acknowledged the following factual proffer:

The Social Engineering Enterprise

The Social Engineering Enterprise ("SE Enterprise") was made up of a group of individuals based in California, Connecticut, New York, Florida, and abroad. The SE Enterprise began on a date unknown but by no later than October of 2023 and continued through at least in or around March 2025. Members and associates of the SE enterprise served different roles and held different responsibilities. The roles included database hackers, organizers, target identifiers, callers, money launderers, and residential burglars targeting hardware virtual currency wallets. The purposes of the SE Enterprise included, but were not limited to, stealing virtual currency from victims throughout the United States through fraudulent pretenses; disguising, concealing, and obfuscating the source and ownership of the stolen funds through the use of virtual currency laundering techniques; and converting laundered virtual currency into fiat currency and wire transfers for use at nightclubs, for the purchase of exotic cars, jewelry, luxury handbags, clothing, private jet rentals, and rental mansions in Los Angeles, the Hamptons, and Miami.

Members and associates of the SE Enterprise used stolen virtual currency to purchase, among other things, (1) nightclub services ranging up to $500,000 per evening, (2) luxury handbags valued in the tens of thousands of dollars which were given away at nightclub parties, (3) luxury watches valued between $100,000 up to over $500,000, (4) luxury clothing valued in the tens of thousands of dollars, (5) rental homes in Los Angeles, the Hamptons, and Miami, (6) private jet rentals for travel, (7) a team of private security guards, and (8) a fleet of exotic cars, ranging in value from $100,000 up to $3,800,000.

In or around early 2024, Desmond met the members of the SE Enterprise. Desmond was introduced to the SE Enterprise through Money Exchanger- I, a money launderer for the SE Enterprise. Desmond assisted Money Exchanger- I by retrieving bulk fiat cash for Money Exchanger- I and delivering it to members of the SE Enterprise as part of Money Exchanger- I's crypto-to-cash money laundering services.

Over time, Desmond learned how members of the SE Enterprise were earning money, which was by stealing cryptocurrency by way of social engineering schemes. On or about September 18, 2024, two members of the SE Enterprise were arrested in *United States v. Malone Lam,* 24-cr-4 I 7 (CKK). Jeandiel Serrano was arrested at Los Angeles International Airport and Malone Lam ("Lam") was arrested in Miami. The arrests and multiple Miami search warrants made national news and were widely reported. Desmond had previously traveled with members of the SE Enterprise to Miami on a private jet but returned to the Los Angeles area shortly before Lam's arrest.

Soon after Lam' arrest, another member of the SE Enterprise asked Desmond to travel to Lam's Los Angeles rental homes and retrieve electronic devices belonging to Lam and Marlon Ferro ("Ferro"). Desmond agreed and traveled to the rental homes owned by Lam, collected one cell phone and two computers belonging to Lam and Ferro, knowing that they contained incriminating evidence and knowing that the FBI was investigating Lam and others. Desmond then destroyed the devices to impair their integrity or availability for use in an official proceeding, that being *US v. Lam,* 24-CR-417 and to prevent the FBI was recovering the devices as part of their investigation.

*See* ECF No. 221. As the Statement of Offense makes clear "[t]hese facts do not constitute all facts known to the parties concerning the charged offenses and covered conduct. This statement is being submitted by the parties to demonstrate that sufficient facts exist to establish that Defendant committed the offenses to which he is pleading guilty." *Id.*

## II.    DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

A.    <u>Generally Applicable Legal Principles</u>

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

        (i) issued by the Sentencing Commission ...; and

        (ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

    (A) issued by the Sentencing Commission ... and

    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

4

With respect to the U.S. Sentencing Guidelines, while they are no longer binding, they should inform the Court's approach to fashioning a sentence that will effectuate the aforementioned goals in § 3353(a). This is so because, as the Supreme Court has recognized, the Guidelines themselves "seek to embody the § 3553(a) considerations, both in principle and in practice." *See Rita v. United States*, 551 U.S. 338, 350, (2007). As the Court elaborated, given the difficulties in balancing the "abstract and potentially conflicting nature of § 3553(a)'s general sentencing objectives, and the differences of philosophical view among those who work within the criminal justice community as to how best to apply general sentencing objectives, it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)' s objectives." *Id.*

    B.    <u>Guidelines Calculations</u>

Turning to 3553(a)(4)(A), for the reasons set forth in its response to the Pre-Sentence Investigation Report (hereinafter, "PSR"), the government agrees with the calculations of U.S. Probation regarding the defendant's Total Offense Level under the U.S. Sentencing Guidelines (hereinafter, "Guidelines") as well as USPO's calculation of his criminal history. As such, the parties agree about the ensuing USSG range.

    1.    *Total Offense Level*

The guideline for 18 U.S.C. § 1512(c)(1) is found in USSG §2J1.2, which provides for a base offense level of 14. *See* PSR at ¶ 36. Because the offense involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects, an additional two levels are added. *See* PSR at ¶ 37. In light of the defendant's early guilty plea, he is entitled to a three-level reduction. *See* PSR at ¶¶ 42-43. Because the defendant meets the criteria set forth at

USSG §§ 4C1.1.(a)(1)-(11), the defendant is a Zero-Offender, and the offense level is reduced by two additional levels. *See* PSR at ¶ 44. As such the Total Offense Level is 11.

> 2. *Criminal History*

The government agrees that the Defendant has no known criminal convictions and as such has a criminal history score of zero, resulting in the defendant being in Criminal History Category ("CHC") I.

> 3. *USSG Range*

In CHC 1, with a Total Offense Level of 11, the defendant's Guidelines range is 8-14 months in Zone B. Because the recommended imprisonment range falls within Zone B of the Sentencing Table, the Guidelines provide that the minimum term may be satisfied in a variety of ways, including: (1) a sentence of imprisonment, (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule set forth in USSG § 5C1.1(e), provided that at least one month is satisfied by imprisonment; or (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment, again, according to § 5C1.1(e).

> C.    Allocution

In light of the defendant's loyalty to and participation in the social engineering enterprise, as well as the severity of his conduct here, destroying crucial digital evidence belonging to two co-conspirators, as well as his continued undermining of the government's investigation by virtue of his participation in the documentary, the government believes that incarceration is necessary to effectuate the purposes of § 3553(a) discussed below. A bottom-of-the-Guideline sentence in which the total sentence is evenly split between incarceration and home confinement is more than

sufficient to account for any mitigating factors at issue in this case, including the defendant's age, lack of criminal history, and relative culpability vis-à-vis others in the enterprise.

1.    *Nature and Circumstances of the Offense*

To begin, as the Court is already aware, the defendant was part of a prolific, profitable social engineering enterprise responsible for stealing well over $250,000,000 in cryptocurrency and laundering it through crypto-to-cash money launderers.  The group rented LA mansions which it used for cybercrime activities.  It also quickly dissipated much of the illicit proceeds on nightclub services, designer clothes, private jet travel, jewelry, and exotic cars, some of which the defendant benefitted from personally.

The defendant's role in the enterprise was not limited to the sole count of obstruction with which he was charged by the grand jury.  Rather, as the evidence gathered to date makes clear, including the Statement of Offense, the defendant was first introduced to the group months prior through Money Exchanger-1, who was providing "crypto-to-cash" services to social engineering scammers in Los Angeles at the time, in which he would take cryptocurrency which Money Exchanger-1 knew to be proceeds of fraudulent activity and convert it to fiat currency for his fraudster clients.  Through Money Exchanger-1, the defendant met co-defendant Lam and other members of the SE enterprise and began to go to nightclubs with them in Los Angeles, never paying for anything and enjoying the various perks that came with being connected to the enterprise, including private jet travel and luxury rental homes.  Ultimately, as he continued to associate with the group, the defendant was entrusted by Money Exchanger-1 and others with picking up bulk fiat cash and then either delivering it to other members of the enterprise as well as paying for things, such as rental homes.  At the beginning, the defendant, by his own admission, was not entirely aware of how Lam and others came to earn the cryptocurrency, though when he asked co-defendant Lam, co-defendant Lam responded by saying "you don't know what to do

what I do." Desmond never asked Money Exchanger-1 or others where the cryptocurrency or the bulk cash he was handling came from. At least in this initial portion, the defendant chose to remain in a state of willful blindness regarding the goings on of the enterprise.

Ultimately, defendant came to learn of how Lam and his associates fraudulently acquired their cryptocurrency. By September 2024, the defendant had travelled with co-defendant Lam and others to Miami and flew out the day before the FBI executed an arrest warrant for co-defendant Lam as well as multiple search warrants in the area. As made clear in the Statement of Offense, the arrests and search warrants made national news at the time. The defendant was informed that co-defendant Jeandiel Serrano had been arrested at the airport and he knew almost immediately of Lam's arrest in Miami. Another member of the SE enterprise instructed him to go to a Malibu rental home where Lam had been staying and destroy his personal computer, by stomping on it and throwing it away in a dumpster. *See* Ex. 1, 16:50-17:09. The defendant later went to co-defendant Ferro's then-residence in Encino, CA and then took his personal computer and smartphone and kept it for a period of time before throwing them off of a bridge in the Pacific Coast Highway. At the point of doing this, the defendant was well aware that there was a nationwide investigation being led by the FBI and that the reason for him being asked to either destroy or take custody of digital devices was to prevent law enforcement agencies from obtaining incriminating information on them.

Yet while one would think that the revelation of where the cryptocurrency funds came from, the arrest of his one-time friends, and his direct, knowing participation in illegal activity would have sufficiently deterred the defendant from associating with the SE enterprise further, it did not. The defendant remained in contact with co-defendant Lam while the latter was incarcerated in the Alexandria Detention Center in Virginia. In December 2024, the defendant

assisted Lam in having other members of the SE enterprise purchase a $60,000 - 70,000 handbag for Lam's Miami girlfriend and shipping the bag.



*Image from Lam's Jail Messages*

In a string of February 3 – 5, 2025 messages, Lam directed the defendant to purchase a $23,400 handbag for his girlfriend and then directed the defendant to fly to Miami to hand deliver the bag to his girlfriend. The defendant complied.



Again, by this point, the investigation into co-defendant Lam was well known to the defendant, as was the fact that co-defendant Lam did not earn the funds for luxury handbags legitimately, but by engaging in social engineering fraud scams. Furthermore, the defendant either knew or should have known that co-defendant Lam laundered their ill-gotten funds through a variety of means, including spending the money on luxury handbags.

And yet, the defendant's loyalty to the enterprise did not end there. In 2025, the defendant began participating in a series of interviews as part of a documentary regarding the SE enterprise.

As part of those interviews, the defendant freely and casually discussed his prior proffer session with the government.  What is especially jarring regarding the interview is not the defendant's discussion of his own conduct – which largely (though not entirely) mirrors what he admitted to as part of his publicly docketed statement of offense – but rather *what else the government was asking about*.  Indeed, the defendant describes to the producers the government's questions about *uncharged* SE engineers, an *uncharged* individual who was associated with the group, and additional people interviewed by the documentary film crew.  *See* Ex. 1, 9:33 – 12:57.  The defendant, in essence, outed possible directions the government's heretofore covert investigation may take as well as additional individuals the government may be targeting as part of such efforts. The public divulgence of investigative strategy – which may one day be broadcasted as part of a documentary[1] - could put the government's further investigative efforts at risk, enabling its targets to do exactly what the defendant did – destroy incriminating evidence.  To the extent that the defendant may wish to argue that this is a risk the government undertakes every time it conducts a proffer session, regardless of the validity of that contention, most individuals who debrief with the government and then choose to reveal the government's investigation strategy do not then turn around and claim they have accepted responsibility for their conduct, like the defendant.  And such individuals do not then tell U.S. Probation that "I was raised to respect the government and law enforcement and what I did is against my values and beliefs.  I was not seeing things very clearly at the time.  I deeply regret my actions as well as the harm I caused and accept responsibility for what I did."  *See* PSR at ¶ 34.  Furthermore, to the extent the defendant wishes to argue that his disclosure of the proffer session questions was simply the product of his naivete and desire to accommodate the producers asking him questions, later on in the interview, the defendant took

---

[1] It is unclear what stage of production the documentary is in at the moment, and, as the Court will see, the interviews of the defendant and others that the government obtained via subpoena in October 2025 were unedited.

care not to name the names of his co-conspirator who directed him to destroy the evidence, even when pressed directly on this topic. *See* Ex. 1 at 17:30-17:46. To recap, then, the defendant was happy to share what the government was interested in, including uncharged targets who would then be able to go out and destroy evidence, but was reluctant to name the individuals involved in the actual conspiracy himself. The defendant's conduct would appear to belie his supposed respect for the government and law enforcement, as well as his desire to make amends for his past obstruction on behalf of the enterprise.

 2.    *History and Characteristics*

Defendant was 19 years-old at the time of offense, had graduated from high school, and was attending college, which he later dropped out of on account of his association with the enterprise. *See generally* PSR, Part C. While his childhood was not without trauma, *see* PSR at ¶¶ 54-58, he did not report abuse and indicated that both his parents loved him, in spite of the various difficulties described in the PSR. He maintained some employment and matriculated at college. *Id.* at ¶ 80. In sum, the PSR does not suggest that the defendant was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct intentionally. Based on the defendant's own admissions, he engaged in this conduct because he wanted to be accepted into this group of individuals and enjoy the lifestyle that they led, including nightclubs, luxury cars, expensive travel and the like. *Id.* at ¶ 80. Even after it became clear to him that his co-conspirators' lifestyle was supported by illegally defrauding other individuals, he continued to associate with them for months thereafter and perform errands for co-defendant Lam.

 3.    *Need for the Sentence Imposed*

The government believes that its proposed sentence will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the

seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.  Only a sentence with some period of incarceration will accomplish those goals.  During his interview, the defendant confidently and breezily suggested that he would probably get a sentence of "probation or house arrest," Ex. 1 at 8:30,[2] and that he will be able to walk away from his continued involvement with the enterprise without ever being incarcerated.  Any such sentence of probation or home confinement would simply confirm the defendant's assumptions that his conduct was not serious and does not warrant any impingement on his liberty.  It would communicate that incriminating evidence can be destroyed without the consequence of incarceration and that you can continue to jeopardize and harm the government's investigation by telling documentary producers about possible investigative avenues the government may be pursuing and who they may be interested in.  Finally, a non-carceral sentence would serve as little deterrent to lower-ranking members of criminal organizations like the charged SE enterprise and would suggest that they could continue to serve important functions within the hierarchy with little prospect of being incarcerated.

The government's proposed sentence – which is at the bottom of the Guidelines and only envisions half of the sentence being carceral – adequately accounts for various mitigating factors, including the defendant's age, his lack of criminal history, and his position within the enterprise, which was admittedly more limited than his co-defendants.  Furthermore, the structure of the plea offer itself also sufficiently factors in these things.  The defendant has pled guilty to § 1512(c)(1), with its corresponding base offense level of 14, and not, for example, § 1962(d), in which his Base

---

[2] At another point in the interview, the defendant suggests he could receive "one year," presumably of incarceration.

Offense Level would be at least 19. This fact is significant because assuming the defendant were to plead guilty § 1962(d), even after applying a three-level reduction for acceptance of responsibility and a two-level reduction for his zero-point offender status, he would still have a Total Offense Level of 14, which, at Criminal History Category I, would place the defendant's Guideline's range at 15-21 months *in Zone D*, where only a carceral sentence would be compliant. Consequently, the government's offer has removed the prospect of the defendant's Guidelines range being in Zone D and enables him to argue for a Guideline compliant sentence that entails alternatives to incarceration.

4.    *Sentencing Disparities*

The government's sentencing recommendation is well-within the bounds of sentences imposed for similar conduct for defendants in the same criminal history category. As the below chart from the U.S. Sentencing Commission's Interactive Data Analyzer demonstrates, the clear majority of the defendants in Criminal History Category I, sentenced with § 2J1.2 as their primary guideline, received prison-only sentences, while only a little more than a quarter received probation-only sentences.



Furthermore, the Judiciary Sentencing Information ("JSIN") reveals that during the last five years, for the eight defendants sentenced under the defendant's Guidelines, with the defendant's criminal history and his total offense level, who received jail time, three received a sentence of imprisonment. The average length of their sentences was 12 months and the median length was eight months. Consequently, the government's recommendation would not create any unwarranted sentencing disparities.

## III.    CONCLUSION

WHEREFORE, the government respectfully requests the Court impose a sentence of eight months' incarceration, followed by a period of supervised release, a condition of which is that four of the eight-month carceral sentence may be served on home detention.

14

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

WILL HART
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia
D.C. Bar No. 1029325
601 D. St., N.W.,
Washington, D.C. 20530
William.hart@usdoj.gov
(202)-252-7877